[No. 59696-4.    En Banc.    July 21, 1994.]

HENDERSON HOMES, INC., ET AL, *Petitioners* v. THE CITY
OF BOTHELL, *Respondent*.

*Groff & Murphy,* by *Michael J. Murphy* and *Celeste T. Stokes; Davis Wright Tremaine,* by *John E. Keegan* and *Stephen M. Rummage,* for petitioners.

*Ogden Murphy Wallace,* by *Wayne D. Tanaka,* for respondent.

*Glenn J. Amster* on behalf of the Building Industry Association of Washington, amicus curiae for petitioners.

BRACHTENBACH, J. — Plaintiffs are three companies which developed residential subdivisions within the city of Bothell (City). As a condition of the preliminary plat approval, the City required execution of "voluntary" agreements under which the developers were required to pay a predetermined $400 per lot as park-impact mitigation fees.

Plaintiffs paid a combined total of $106,000 in such impact fees in 1986 and 1987. Plaintiffs sued for a refund of those fees in 1989. Bothell argued that the suit was time barred by a 30-day limitation in the platting statute, RCW 58.17.180, and that the developers should be estopped from their refund claims.

The trial court held that the suit was timely because Bothell had not complied with RCW 82.02.020, the statute which authorizes impact fees, and, therefore, the 3-year statute of limitations, applicable to actions for the refund of taxes, fees or indirect charges on development, was the governing limitation. The trial court ordered a refund of the fees and prejudgment interest.

The Court of Appeals reversed with Judge Agid dissenting. *Henderson Homes, Inc. v. Bothell*, 67 Wn. App. 196, 834 P.2d 1071 (1992). The majority held that the claims for refunds were barred by estoppel and by the 30-day limitation of RCW 58.17.180. We reverse the Court of Appeals and affirm the trial court.

The key focus is on RCW 82.02.020 as it existed at relevant times. The City collected these impact fees, as a condition of plat approval, relying solely on RCW 82.02.020. That statute begins with an absolute *prohibition* against these impact fees: "[N]o county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect . . . on the development, subdivision, classification, or reclassification of land."

There are two narrowly drawn exceptions to this absolute prohibition: (1) "However, this section does not preclude dedication of land or easements [pursuant to RCW 58.17.110, the platting statute]" under certain conditions. RCW 82.02.020. Bothell concedes and the trial court found that Bothell never sought dedication of land to mitigate impacts so this exception is irrelevant.

The second exception is the *sole* authority for the fees extracted in this case. It provides: "This section does not prohibit *voluntary* agreements with . . . cities . . . that allow a payment . . . to mitigate *a direct impact* that has been *identified* as a *consequence* of a proposed development, subdivision, or plat." (Italics ours.) RCW 82.02.020. Since it is only this statute which authorized these fees, it must be examined in detail, along with the findings of fact.

## The Requirements of The Statute and The Findings of The Trial Court

| The Statute | Findings of Fact |
| --- | --- |
| (1) Must be *voluntary agreement* | (1) "The fee agreements were not executed voluntarily." |
| (2) To mitigate a direct impact that has been identified. | (1) "Bothell failed to identify any direct impacts of plaintiffs' developments on the Bothell park system." *No error assigned to this finding.* (2) ". . . There are no documents or records supporting any analysis by the City of Bothell of the direct impacts of plaintiffs' developments on the park system." *No error assigned to this finding.* |
| (3) Funds may be expended *only* for capital improvements, *agreed upon by the parties to mitigate the identified direct impact.* | (1) "No capital improvements were ever identified by Bothell or agreed to by plaintiffs that related to mitigation of any impact of plaintiffs' developments on the park system. Bothell made no attempt to correlate fund expenditures with any impacts of plaintiffs' developments." *No effective error assigned to this finding.* |

The findings of fact and conclusions of law are set out in the appendix. However, the status of the findings must be made clear. Two findings are critical and bear repeating. Finding of fact 12: "Bothell failed to identify any direct impacts of plaintiffs' developments on the Bothell park system." Clerk's Papers, at 83. *No error is assigned to this finding.* Finding of fact 13: "Beyond the conclusionary statements contained in the plat approval conditions for plaintiffs' development, there are no documents or records supporting *any analysis* by the City of Bothell *of the direct impacts* of plaintiffs' developments on the park system."

(Italics ours.) Clerk's Papers, at 83. *No error is assigned to this finding.* We must compare those unchallenged findings to the requirement of the statute which must be met to extract an impact fee: "[T]o mitigate a *direct impact that has been identified* as a *consequence* of a proposed development, subdivision, or plat." RCW 82.02.020.

We will summarize or paraphrase other findings of fact which demonstrate clearly that there was a total lack of compliance with the statute. Therefore, the impact fees are unauthorized, constitute an illegal tax, fee or charge and result in an unjust enrichment to the City, all of which leads to application of the 3-year statute of limitations.

■ Bothell does assign error to the findings mentioned hereafter. However, Bothell nowhere argues that the findings are not supported by substantial evidence, it makes no cites to the record to support its assignments, and cites no authorities. Therefore, its assignments of error to the findings are without legal consequence and the findings must be taken as verities. It is elementary that the lack of argument, lack of citation to the record, and lack of any authorities preclude consideration of those assignments. The findings are verities. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); *American Legion Post 32 v. Walla Walla*, 116 Wn.2d 1, 7, 802 P.2d 784 (1991); *Transamerica Ins. Group v. United Pac. Ins. Co.*, 92 Wn.2d 21, 29, 593 P.2d 156 (1979); *Lewis River Golf, Inc. v. O.M. Scott & Sons*, 120 Wn.2d 712, 725, 845 P.2d 987 (1993); *Bowles v. Department of Retirement Sys.*, 121 Wn.2d 52, 80, 847 P.2d 440 (1993).

The relevant findings of fact disclose the following:

1. Bothell had no formula nor ascertainable standards so that a determination of the impact of a project on the park system could be made. (Finding of fact 7.)

2. Bothell "failed to consistently and rationally take into account existing park and recreation facilities in determining the impact of plaintiffs' developments". (Finding of fact 8.) Clerk's Papers, at 82.

3. Bothell's own park plan required consideration of school recreation facilities as part of the park inventory, but in assessing the impact of projects, Bothell ignored its own plan and gave no credit to school recreation facilities. (Finding of fact 9.)

4. When plaintiffs developed their subdivisions, there was a surplus of recreation facilities under Bothell's *own standards*. (Finding of fact 10.)

5. Bothell did not undertake any understandable analysis to identify the direct impacts of the developments. (Finding of fact 11.)

6. Bothell never requested that plaintiffs dedicate land for park purposes. (Finding of fact 17.)

In addition to extracting fees as condition of plat approval in complete disregard of the very clear requirements of the statute, the City totally ignored the statutory requirements as to spending the impact fees. The *specific* fees are to be held in a reserve account, and "may *only* be expended to fund a capital improvement *agreed upon by the parties* to mitigate the *identified, direct impact*". (Italics ours.) RCW 82.02.020(1).

Again, the findings of fact are compelling against Bothell. They were:

1. No capital improvements were ever identified by Bothell *or agreed to by plaintiffs* (as required by the statute). (Finding of fact 19.)

2. Bothell made no attempt to correlate expenditures of the fees with any impacts (as required by statute). (Finding of fact 18.)

3. Bothell expended part of these fees for other than capital improvements (prohibited by the statute). (Finding of fact 21.)

The position of the City is best summarized by testimony from its own witness that any correlation between fees paid by plaintiffs and expenditures for the impacts of their projects would be purely coincidental. Verbatim Report of Proceedings vol. 4, at 588, 595-604, 607-10.

The City repeatedly claims that these agreements were voluntary. An internal city memorandum shows why the trial court could and did find they were not voluntary. The internal memorandum is from the acting planning administrator for city council information and includes an analysis by the city attorney regarding "voluntary" agreements. It states in part:

> There must be emphasis on making sure that the agreement is "voluntary". Again, a good record during the proceeding is essential. These include:
>
> (a) Staff statements that the developer has volunteered . . ..
>
> (b) Ask the developer during the course of the hearing if he has voluntarily made the offer or if he agrees with the proposed written conditions.
>
> (c) If the developer qualifies the response in any way *pursue it until the 'damning admission'* is elicited.
>
> . . . .
>
> (e) If the impacts are not mitigated through the voluntary agreement and cannot be otherwise mitigated, *then deny the proposal.*

(Italics ours.) Clerk's Papers, at 375-76, 362-80.

The testimony of the developers supports the finding that these were not "voluntary" agreements. They were not negotiated as to the impact amount to be paid or how the funds were to be spent. One of the developers was presented the "voluntary" agreement at the hearing on his application. The Bothell planning administrator told him the city council wanted it signed. Even though the "voluntary" agreement had never been discussed, it provided that he had voluntarily agreed to contribute $45,000 for the park mitigation fee. When the applicant asked what would be the consequences if they did not sign the agreement, he was told "it would probably be the eventual disapproval of my project." Verbatim Report of Proceedings vol. 1, at 33.

■ We first consider whether this refund suit was timely brought. The Court of Appeals reasoned that RCW 82.02.020 *supplements* RCW 58.17.020, and therefore, a writ of review must be brought within 30 days. It erred therein. The platting statute, RCW 58.17, is just that, a platting statute. Specifically, it relates, by its very terms, to the *subdivision* of

land. RCW 58.17.010. However, the voluntary payment of fees in RCW 82.02.020 is much broader because it includes more than plats or subdivisions. It specifically authorizes such fee agreements for *developments* in addition to plats or subdivisions. Thus, construction, remodeling and rezoning are all covered by RCW 82.02.020, yet how can those activities be governed by the platting statute which excludes those activities by its own definitions? The basic premise that RCW 82.02.020 supplements RCW 58.17 collapses when RCW 82.02.020 is read in its entirety. It would be an absurd result to hold that only one of the activities described in RCW 82.02.020, platting, is subject to the time limitation of RCW 58.17, but the other half of the statute must have some other unknown statute of limitations.

Further, when the Legislature intended to have the platting statute apply to RCW 82.02.020, it said so. After prohibiting any tax, fee, or charge on subdivisions, among other actions, it specifically referenced RCW 58.17.110 to permit dedication of lands under RCW 58.17. When it came to the fees here imposed, it made no such reference. Again, this cuts out the essence of the analysis for applying RCW 58.17 to RCW 82.02.020.

The inquiry then is what is the nature of these fees which were not imposed according to the only statutory authority for their imposition? RCW 82.02.020 itself provides the answer for it prohibits any tax, fee, or charge, either direct or indirect, on the subdivision of land, *unless* the fee is imposed pursuant to the voluntary agreement exception described above. *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 409, 780 P.2d 838 (1989) is perfectly clear in its holding that we apply RCW 82.02.020 according to its plain and unambiguous terms. *R/L Assocs.* holds that a charge in violation of RCW 82.02.020 is invalid.

The holdings in *R/L Assocs.* are consistent with the principles of *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 810-11, 650 P.2d 193 (1982), even though *Hillis Homes* predated the language of RCW 82.02.020 which applies here. In *Hillis Homes*, the court held that a preset, per lot

fee was an unauthorized tax. Here, Bothell also extracted a preset, per lot fee. Because the City made no attempt to comply with the limited authorization of RCW 82.02.020, the fees are exactly those prohibited by that statute.

This court has consistently held that the 3-year statute of limitations, RCW 4.16.080(3), applies to actions to recover invalid taxes. The same principle applies to fees or charges, direct or indirect, on the subdivision of land when they do not comply with RCW 82.02.020. The underlying rationale for applying the 3-year statute is solidly grounded and long established. Such suits "are actions arising out of implied liabilities to repay money unlawfully received". *Adams Cy. v. Ritzville State Bank*, 154 Wash. 140, 144, 281 P. 332 (1929). We applied the 3-year statute to a refund claim for an invalid tax as recently as *Robinson v. Seattle*, 119 Wn.2d 34, 83, 830 P.2d 318, *cert. denied*, 121 L. Ed. 2d 598 (1992).

If there is any doubt that these fees, under these facts, are an invalid tax, fee, or charge, another provision of RCW 82.02.020 makes clear the legislative intent to proscribe narrowly the imposition of such fees. The statute provides:

> *No* county, *city*, town, or other municipal corporation *shall require any payment* as part of such a voluntary agreement *which the* county, *city*, town, or other municipal corporation *cannot establish is reasonably necessary as a direct result of the proposed development or plat.*

(Italics ours.) RCW 82.02.020. As shown above and as found by the trial court, the City of Bothell certainly did not meet the burden placed on it by the quoted part of the statute, but rather failed to meet any of the requirements of the statute.

Next we turn to the holding of the Court of Appeals that Plaintiffs' claims are barred by estoppel. Application of the doctrine of equitable estoppel requires a showing that the party to be estopped (1) made an admission, statement, or act which was inconsistent with his later claim; (2) that the other party relied thereon; and (3) that the other party would suffer injury if the party to be estopped were allowed to contradict or repudiate his earlier admission, statement,

or act. *PUD 1 v. Walbrook Ins. Co.*, 115 Wn.2d 339, 347, 797 P.2d 504 (1990); *Wendle v. Farrow*, 102 Wn.2d 380, 382-83, 686 P.2d 480 (1984). Equitable estoppel is not favored, and the party asserting estoppel must prove each of its elements by clear, cogent, and convincing evidence. *Chemical Bank v. WPPSS*, 102 Wn.2d 874, 905, 691 P.2d 524 (1984), *cert. denied*, 471 U.S. 1065, 85 L. Ed. 2d 497, 105 S. Ct. 2140 (1985); *Mercer v. State*, 48 Wn. App. 496, 500, 739 P.2d 703, *review denied*, 108 Wn.2d 1037 (1987).

As stated earlier, RCW 82.02.020 prohibits development fees except those derived from voluntary agreements that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat. The payment is to be held in a reserve account and may only be expended to fund a capital improvement agreed upon by the parties to mitigate the identified, direct impact.

It is clear from the record that Bothell was spending the developers' impact fees for general park use rather than to mitigate site-specific impacts as required by RCW 82.02.020. Since nothing in the agreements or in the developers' actions can be construed to permit these expenditures, Bothell fails to meet its burden of establishing that the developers made an agreement which they later repudiated to the City's detriment.

The doctrine of estoppel is available to innocent parties only. *Mutual of Enumclaw Ins. Co. v. Cox*, 110 Wn.2d 643, 650-51, 757 P.2d 499 (1988); *Stohr v. Randle*, 81 Wn.2d 881, 884-85, 505 P.2d 1281 (1973). From the record we conclude that Bothell does not have the requisite "clean hands" necessary to assert estoppel. Since Bothell has violated RCW 82.02.020, it is not entitled to use estoppel as a bar to the developers' claim. *See Mutual of Enumclaw Ins. Co. v. Cox, supra; Stohr v. Randle, supra.*

The Court of Appeals is reversed; the judgment of the trial court is affirmed.

## APPENDIX

### Findings of Fact

1. Plaintiffs all developed residential subdivisions located within the City of Bothell. Henderson Homes, Inc. (Henderson) developed Amber Ridge, a 162-unit subdivision; Conner Development Co. (Conner) developed Morningside, a 77-unit subdivision; and Dujardin Development Co. (Dujardin) developed Camden Highlands II, a 26-unit subdivision.

2. Defendant City of Bothell is a municipal corporation located within King County, Washington.

3. In 1982 the City of Bothell engaged in litigation with H & K Development and Greenview, Inc., over a proposed development called the "Villages". This prior litigation was limited to issues regarding alteration of the project, design, densities, road improvements, police and fire staffing requirements, and the indemnity covenants that were required by the City of Bothell. The issue of parks mitigation was not litigated.

4. In its conditions of approval for the proposed Villages project, the City of Bothell made no final determination that the developers of that project would be required to pay park fees.

5. Henderson's Amber Ridge project was substantially and materially different in type, density and size from the predecessor Villages project. The Villages was a proposed 562-unit multifamily planned unit development, consisting of four parts, designated Villages I-IV. Amber Ridge is a 177-unit single family subdivision that encompasses what was formerly Village II, in addition to other property that was never part of the proposed "Villages" development.

6. Plaintiffs or their predecessors in interest all sought approval of their developments from the City of Bothell, and submitted plat applications.

7. Bothell does not have a formula or any ascertainable standards to measure the demand created by a project against the existing supply of park facilities, so that a determination of the impact of a project on the park system can be made.

8. Bothell failed to consistently and rationally take into account existing park and recreation facilities in determining the impact of plaintiffs' developments on the park system.

9. Bothell's park plan states that school recreation facilities should be included as part of the park inventory. However, in assessing the impact of projects, Bothell gave no credit to school recreation facilities in determining the existing supply of park facilities.

10. At the times plaintiffs developed their subdivisions, there existed a surplus of park and recreation facilities in Bothell for both community parks and neighborhood parks (in the relevant neighborhoods) under Bothell's own standard of 10 acres of developed park land per 1,000 population.

11. The City of Bothell did not undertake any understandable analysis to identify the direct impacts of plaintiffs' developments on the Bothell park system.

12. Bothell failed to identify any direct impacts of plaintiffs' developments on the Bothell park system.

13. Beyond the conclusionary statements contained in the plat approval conditions for plaintiffs' developments, there are no documents or records supporting any analysis by the City of Bothell of the direct impacts of plaintiffs' developments on the park system.

14. Despite this absence of analysis, plaintiffs were required, as a condition of approval of their preliminary plats, to pay a park fee to the City of Bothell. Henderson paid $29,600 and $36,400 on June 30, 1987, and August 20, 1987, respectively, of which $1,200 was refunded on February 22, 1989; Conner paid $15,600 and $15,200 on September 18, 1986, and May 18, 1987, respectively; and Dujardin paid $10,400 on May 19, 1986. Dujardin paid its fee under protest.

15. Prior to paying the fees, plaintiffs or their predecessors in interest were required by Bothell to execute "voluntary fee agreements". The fee agreement for Amber Ridge was executed on February 25, 1987; the fee agreement for Morningside was executed on December 12, 1985; and the fee agreement for Camden Highlands II was executed on June 11, 1984.

16. The fee agreements were not executed voluntarily.

17. Bothell never requested that plaintiffs dedicate land for park purposes.

18. Bothell made no attempt to correlate fund expenditures with any impacts of plaintiffs' developments, on either a neighborhood or community basis.

19. No capital improvements were ever identified by Bothell or agreed to by plaintiffs that related to mitigation or any impact of plaintiffs' developments on the park system.

20. Bothell allocated park fees so that they would be spent within 5 years of collection, without regard to mitigating an identified, direct impact of the project for which the fees were assessed.

21. Bothell expended some of the park fees it collected on items other than capital improvements.

22. Plaintiffs filed their complaint against the City of Bothell on May 16, 1989. On March 13, 1989, more than 60 days prior to filing their complaint, plaintiffs filed an administrative claim with the City of Bothell.

## Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter of this action.

2. Plaintiffs' claims are subject to the 3-year statute of limitations applicable to actions for the refund of taxes, fees or indirect charges on

development. Because plaintiffs all brought their claims within 3 years of payment of the fees, these claims were timely brought.

3. The doctrine of res judicata does not apply to the Amber Ridge project by reason of the prior litigation over the Villages project. There is insufficient identity of claims and subject matter to warrant application of res judicata to Amber Ridge. Additionally, Bothell failed to plead res judicata in its answer as required by CR 8(c). Bothell is therefore procedurally precluded from raising this defense.

4. RCW 82.02.020, which was in effect at all times relevant to this case, allows municipalities and developers to enter into voluntary fee agreements in lieu of land dedication by the developer, or to mitigate a direct impact that had been identified as a consequence of the proposed development.

5. The park mitigation fees imposed by the City of Bothell on plaintiffs violated RCW 82.02.020. The fees constituted indirect fees on plaintiffs' developments to supply revenue for the general park system, and were not regulatory in nature.

6. RCW 82.02.020 places the burden on the City of Bothell to identify direct impacts of plaintiffs' developments on the Bothell park system. Bothell failed to meet this burden.

7. The fees charged plaintiffs by the City of Bothell were not reasonably necessary as a direct result of plaintiffs' developments.

8. Under the circumstances of this case, the fee agreements were not executed voluntarily.

9. Bothell's expenditure of park fees violated the requirements of RCW 82.02.020. Specifically, Bothell failed to consult with plaintiffs prior to expending fees collected from them; failed to spend the fees on capital improvements designed to mitigate an identified, direct impact of plaintiffs' developments; and spent some of the park fees collected on items other than capital improvements.

10. Plaintiffs are entitled to a return of the $106,000 in fees they paid to the City of Bothell, as well as prejudgment interest at the statutory rate from the date the fees were paid. Specifically, Henderson is entitled to $64,800, plus prejudgment interest; Conner is entitled to $30,800, plus prejudgment interest; and Dujardin is entitled to $10,400, plus prejudgment interest.

ANDERSEN, C.J., and UTTER, DURHAM, SMITH, and JOHNSON, JJ., concur.

MADSEN, J. (dissenting) — In some respects, I agree with the majority opinion. I agree with the majority that the City of Bothell violated the requirements of RCW 82.02.020 in imposing and expending the impact mitigation fees in this

case. I do not question the accuracy of the majority's 8-page recitation of facts showing how egregious Bothell's actions were and how the City paid lip service to the requirements of RCW 82.02.020. I also agree with the majority's conclusion that RCW 82.02.020 prohibits fees unless they are imposed pursuant to the terms of the statute.

What I question is the majority's conclusion, supported by two paragraphs of analysis and the citation of two cases, that a fee imposed in violation of RCW 82.02.020 is a tax, and that a challenge to such a fee is governed by the 3-year statute of limitations applicable to actions brought to recover invalid taxes. While interesting reading, the majority's eight pages of facts are essentially irrelevant to a discussion of the timeliness of the developers' claims.

Under the majority's approach, every challenge to fees assessed under RCW 82.02.020 would turn first to a discussion of whether the statute had been violated, and then to a consideration of whether the challenge was timely. Apparently, a conclusion that the statute had *not* been violated would preclude use of the 3-year statute of limitations and leave the question of the appropriate statute of limitations in limbo, given the majority's insistence that the 30-day statute of limitations applicable to platting decisions has no relevance to fees imposed as a condition of plat approval. In assessing a challenge to fees imposed pursuant to RCW 82.02.020, I would first examine the nature of the fees authorized by RCW 82.02.020 and the corresponding statute of limitations, and then, if the challenge were timely, determine whether the requirements of RCW 82.02.020 had been satisfied. It is my understanding that the timeliness of a legal challenge is addressed before the merits of the challenge are assessed.

The majority's conclusion that the fees assessed herein are equivalent to taxes is supported only by brief citations to *R/L Assocs., Inc. v. Seattle*, 113 Wn.2d 402, 780 P.2d 838 (1989) and *Hillis Homes, Inc. v. Snohomish Cy.*, 97 Wn.2d 804, 650 P.2d 193 (1982). As my analysis illustrates, neither case supports the majority's conclusion that the 3-year statute of

limitations governing unauthorized taxes applies in this case. In *Hillis Homes*, we addressed the validity of regulations requiring payment of fees for various services as a condition of subdivision approval. *Hillis Homes*, at 806-07. Under review were fee agreement ordinances enacted by Snohomish and San Juan Counties prior to the 1982 amendment of RCW 82.02.020. The fees collected pursuant to the county ordinances were intended to pay for community services required as a result of substantial new residential development. This court reasoned that absent specific statutory authority to assess mitigation fees, the counties' actions could be upheld as an exercise of their police powers only if the payments were intended as tools to regulate land subdivision. The court looked to the primary purpose served by imposition of these fees and concluded that the payments were intended to raise revenue, not to regulate development. Consequently, the court concluded that the fees were really taxes which the County lacked authority to levy. *Hillis Homes*, at 810-11. In 1982, the Legislature amended RCW 82.02.020 to specifically address development fees. Any analysis of development fees now must begin with a review of that statute. As the majority notes and as this court observed in *R/L Assocs.*, it is necessary to give literal application to the provisions of RCW 82.02.020 when addressing development fees.

The amendment begins with a prohibition against any tax on development. It then outlines a narrow exception for fees which are directly related to the impact of development.

> [T]his section does not preclude dedications of land or easements within the proposed development or plat which the county, city, town, or other municipal corporation can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply.
>
> This section does not prohibit voluntary agreements with counties, cities, towns, or other municipal corporations that allow a payment in lieu of a dedication of land or to mitigate a direct impact that has been identified as a consequence of a proposed development, subdivision, or plat.

RCW 82.02.020 (in part). In contrast to the fees authorized under this amendment, the fees imposed in *Hillis Homes*

were not tied to a specific, identified impact of a development on a community. Rather, they were assessed uniformly, in a preset amount, regardless of the specific need created by a given development. The fees authorized by RCW 82.02.020 are not to be imposed automatically, but are instead tied to a direct impact. If there is no such impact, the fees may not be imposed on a developer. Thus, the primary purpose of the fees is not simply to raise money. Rather, by tying the imposition of fees to the actual impact of development, the fees are tools to regulate development, not taxes collected as general revenue. *See Hillis Homes*, at 809.

This conclusion finds support in the legislative history behind the 1982 amendment of RCW 82.02.020. When the Legislature amended RCW 82.02.020 it recognized the need of local governments for new sources of revenue to provide basic services to their residents. At the same time it acknowledged that development fees were onerous for the building industry. 1982 Final Legislative Report 206. To balance these concerns, the Legislature restricted development fees and authorized a real estate excise tax. 1982 Final Legislative Report 206-08.

> Development fees are substantially restricted so that no county, city, town or municipal corporation may impose a tax or fee on any construction project. . . .
>
> . . . .
>
> Because the development fees provision is enacted into law, cities and counties are authorized to levy a real estate excise tax not exceeding one-quarter of 1 percent. *This authorization is intended to replace the loss of revenue from the restriction on system development charges.* . . .
>
> . . . .
>
> . . . The proceeds from the first one-quarter real estate excise tax levied in lieu of development fees will be used for capital purposes . . ..

(Italics mine.) 1982 Final Legislative Report 207.

The Legislature thus replaced revenue previously generated from general development fees with a tax on real estate, but allowed a narrowly defined category of fees to survive. Thus, the Legislature's intent to distinguish these

fees from the new taxes authorized seems clear. Instead of serving simply as another means to raise general revenue, the development fees allowed were intended to regulate actual impacts of a development on the community. Statutes should not be interpreted so as to render any portion meaningless or superfluous. *Addleman v. Board of Prison Terms & Paroles*, 107 Wn.2d 503, 509, 730 P.2d 1327 (1986); *Hanson v. Tacoma*, 105 Wn.2d 864, 871, 719 P.2d 104 (1986). Since the Legislature discussed the development impact fees in a separate provision from that setting forth the real estate excise tax, it is evident that the impact fees were intended to function differently than taxes. This intent is made clearer by a discussion held during the hearing on the proposed amendment. During the hearing, Representative Eberle was asked to explain the meaning of "voluntary agreement" in the proposed exemption for development fees. House Journal, 47th Legislature (1982), at 1417. Mr. Eberle referred to Justice Neill's dissent in *Chrobuck v. Snohomish Cy.*, 78 Wn.2d 858, 480 P.2d 489 (1971) which he said defined the term. Under consideration in *Chrobuck* was a rezone approved by the Board of County Commissioners in Snohomish County. The commissioners gave approval based upon a "concomitant agreement" executed between the County and Atlantic Richfield, the petitioner for rezone. The agreement provided for environmental controls and a buffer zone surrounding the proposed refinery.

Justice Neill explained the use of "concomitant agreements".

> *Basically, a valid concomitant agreement operates to neutralize any expected negative impact of the proposed property usage . . ..* As such, they are based upon factors which are squarely within the ambit of considerations appropriate in the exercise of the zoning power. As thus limited, the concomitant agreement provides a source of flexibility by allowing an intermediate use permit, between absolute denial and complete approval of the petition. *A zoning authority, empowered to permit a given use without restriction, should also be allowed to grant a use which is modified by contract conditions appropriately attached.*

(Italics mine.) Chrobuck, at 889 (Neill, J., dissenting).

While the comments of individual legislators are insufficient to establish legislative intent, they can be instructive in showing the reasons for legislative amendments. *In re Marriage of Kovacs*, 121 Wn.2d 795, 807, 854 P.2d 629 (1993); *Johnson v. Continental West, Inc.*, 99 Wn.2d 555, 561, 663 P.2d 482 (1983). Representative Eberle's comparison of the voluntary agreements in RCW 82.02.020 with the "concomitant agreements" in *Chrobuck* indicates that the voluntary fee agreements were to be used by local authorities, pursuant to their police powers, to regulate development. The majority makes ample use of the record, but in so doing overlooks the fundamental fact that the fees imposed herein were imposed as a condition of plat approval. Hence, it does not seem unreasonable to look to the statutes governing platting decisions and plat approval for guidance in this case. Municipalities have a duty to provide for public facilities under the subdivision statute, RCW 58.17.110. Thus, it is reasonable to conclude that these fee agreements were intended to provide an alternative means for ensuring appropriate provisions are made, thus regulating rather than merely taxing developers. *See Trimen Dev. Co. v. King Cy.*, 124 Wn.2d 261, 270, 877 P.2d 187 (1994); *Ivy Club Investors Ltd. Partnership v. Kennewick*, 40 Wn. App. 524, 530, 699 P.2d 782, *review denied*, 104 Wn.2d 1006 (1985).

RCW 58.17.110 provides that a local legislative body may approve the establishment of subdivisions within the community by inquiring

> into the public use and interest proposed to be served by the establishment of the subdivision and dedication. It shall determine: (a) [i]f appropriate provisions are made for . . . the public health, safety, and general welfare, for open spaces, drainage ways, streets or roads . . . parks . . . playgrounds, schools and schoolgrounds, and . . . all other relevant facts, including sidewalks and other planning features that assure safe walking conditions for students who . . . walk to and from school; and (b) whether the public interest will be served by the subdivision . . . ..

RCW 58.17.110. A plat may be disapproved if provisions are not made for such public facilities. RCW 58.17.110. To insure

that appropriate provisions are made, RCW 58.17.110 also provides that "[d]edication of land to any public body . . . may be required as a condition of subdivision approval . . .". The authority to exact land dedication for the purpose of providing a range of public facilities required as a result of development is well established. *Breuer v. Fourre*, 76 Wn.2d 582, 585, 458 P.2d 168 (1969); *Olympia v. Palzer*, 42 Wn. App. 751, 754 n.3, 713 P.2d 1125, *aff'd*, 107 Wn.2d 225, 728 P.2d 135 (1986). Through the amendment of RCW 82.02.020, the Legislature provided alternative ways to meet the impact of development on the public facilities enumerated in RCW 58.17.110. The voluntary agreements contemplated by the 1982 amendment operate to "neutralize any expected negative impact of the proposed property usage", and are clearly intended to regulate development. *See Chrobuck*, at 889 (Neill, J., dissenting). Thus, even under *Hillis Homes*, they do not constitute a tax subject to the 3-year statute of limitations in RCW 4.16.080(3). RCW 82.02.020 does not include a review mechanism in event of violation. Where a statute provides no express mechanism for appeal, but instead supplements existing authority, claims based on the supplemental statute must be brought in accordance with the statutory procedures for challenging the underlying government action. *Henderson Homes, Inc. v. Bothell*, 67 Wn. App. 196, 204-05, 834 P.2d 1071 (1992); *South Hollywood Hills Citizens Ass'n for Preserv. of Neighborhood Safety & Env't v. King Cy.*, 33 Wn. App. 169, 173, 653 P.2d 1324 (1982), *rev'd on other grounds*, 101 Wn.2d 68, 78, 677 P.2d 114 (1984). The authority to require developers to make provisions for adequate park facilities as a condition of plat approval is grounded in RCW 58.17.110. It is through the dedication of land or fee impact agreements that local governments carry out their regulatory function. Therefore, I conclude that RCW 82.02.020 supplements RCW 58.17.110. This being the case, claims based on a violation of that part of the statute referring to fee impact agreements executed to provide for required plat conditions must be brought in accordance with RCW 58.17.180.

The language of RCW 58.17.180 is clear: a 30-day limitation applies to an action challenging any decision approving or disapproving any plat. The fees at issue here were imposed as a condition of plat approval, so any challenge of their imposition is subject to the 30-day statute of limitations. The majority's heavy reliance on factual support totally ignores the public policy supporting short appeal periods and finality in land use decisions. *See Deschenes v. King Cy.*, 83 Wn.2d 714, 717, 521 P.2d 1181 (1974); *Veradale Vly. Citizens' Planning Comm. v. Board of Cy. Comm'rs*, 22 Wn. App. 229, 239, 588 P.2d 750 (1978). In this case, the developers gave Bothell no significant indication that they objected to the park fees or to the intended use of said fees. Instead, the developers completed construction and sold a majority of the units in each development. Verbatim Report of Proceedings, at 53, 100. Three years later they claimed a refund. It is in the interest of the general welfare of the community that objections to conditions imposed on developments be resolved quickly, while meaningful remedies are available.

It is similarly within the interests of the general welfare that a clear resolution of this case be made, as the issue of the limitations period applicable to impact fee challenges will continue to arise. In 1990, the Legislature expanded upon the possibilities for impact fees. *See* RCW 82.02.020, .050-.090. The Legislature did not, however, state what limitations period applies when these fees are challenged. Thus, when faced with a challenge to impact fees, courts will be forced to run through the tax or fee analysis set forth by the majority. As a result, the issue of the proper statute of limitations will continue to be subsumed by the merits of the case, in large part because of the majority's almost exclusive reliance on *Hillis Homes*, a case decided before RCW 82.02.020 was first amended to authorize impact fees.

Soon after its publication, *Hillis Homes* was criticized by this state's leading authority on land use law. *See* Richard L. Settle, *Washington Land Use and Environmental Law and Practice* § 3.13(a), at 113 (1983). Professor Settle writes that in *Hillis Homes,*

[t]he court rather mechanically characterized the fees as taxes without considering their function in the land use regulatory process. The exaction of land dedication for, and improvements of, various public facilities traditionally has been characterized as exercise of the police power. The rationale is that without the required land dedication and improvements public facilities would be inadequate, communities would be deficient as human habitat, and the public health, safety and welfare would suffer. Development fees may be a more equitable means of accomplishing the same police power objectives than exaction of land dedication and public facilities improvements. Hence, characterizing the fees as taxes because they happen to raise revenue ignores their regulatory function, elevating form over function.

Settle § 3.13(a), at 113. Another commentator has criticized *Hillis Homes* for its failure to acknowledge that because RCW 58.17.110 places responsibility on local government to ensure that public facilities are provided for as a condition of plat approval, local government must have tools for administering this responsibility beyond taking a dedication of land. Martha Lester, Comment, *Subdivision Exactions in Washington: The Controversy Over Imposing of Fees on Developers*, 59 Wash. L. Rev. 289, 295-96 (1984).

The majority ignores these criticisms and retains a method of analysis that makes little sense in light of the 1982 amendment to RCW 82.02.020 and even less sense in light of subsequent amendments to RCW 82.02.

I therefore dissent, based on my belief that the 30-day statute of limitations applicable to platting decisions applies to the developers' challenge to Bothell's imposition of impact fees in this case. I would hold, however, that a 3-year statute of limitations period applies to their expenditure challenge. I find no language in RCW 58.17 purporting to govern the expenditure of impact mitigation fees. The direction for expenditure comes from RCW 82.02.020 which provides that funds not expended in compliance with the statute, within a 5-year period, shall be refunded. Similar claims for refunds of fees lawfully collected, but expended in violation of statutory requirements, have been governed by the 3-year statute of limitations applicable to "action[s] for taking, detaining,

or injuring personal property, including an action for the specific recovery thereof, or for any other injury to the person or rights of another". *Amende v. Bremerton*, 36 Wn.2d 333, 340, 217 P.2d 1049 (1950); *Quaker City Nat'l Bank v. Tacoma*, 27 Wash. 259, 263, 67 P. 710 (1902). This language is now set forth in RCW 4.16.080(2).

I would conclude that the 3-year statute of limitations in RCW 4.16.080(2) governs the developers' expenditure challenge, and would remand to see what portion of the development fees, if any, was spent in accordance with the requirements of RCW 82.02.020. If such amounts can be determined, the court shall refund the misspent portions in accordance with the terms of RCW 82.02.020. If proper accounting cannot be made, I would direct the trial court to order a refund of $400 per lot, according to the number of lots still owned by the developers at the time of the trial court's initial decision in this case. Contrary to the refund directed by the majority, my remedy would give effect to the statutory language providing that *"[a]ny payment* not so expended *shall be refunded* with interest at the rate applied to judgments *to the property owners of record at the time of the refund."* (Italics mine.) RCW 82.02.020(3).

GUY, J., concurs with MADSEN, J.